# Marshall Walter et al., Appts., *v.* William H. Snowden, Exr. of Israel H. Walter, Deceased, et al.

A resulting trust may be established by parol evidence; but such evidence must be clear and unequivocal.

In 1866 William Walter requested his daughters to look out for a farm for their brother Marshall. They reported the approaching sale of a farm, and the father directed Israel, another son, to buy the farm and hold it in trust for Marshall for life, and after Marshall's death for his children. The father said that he would pay for it. Israel bought the farm and Marshall took possession of it. There was no direct evidence whether it was paid, for with the father's money or Israel's. Israel was well able to pay for it. The father died. In 1868 Israel made a will by which he devised the farm to trustees for the use of Marshall during life and afterward to Marshall's children. In 1878 Israel became embarrassed and made an assignment for the benefit of creditors, but did not include this farm in his inventory. Israel died in 1881 and, *in extremis*, devised the farm to his daughters. Marshall filed a bill in 1883 against Israel's executor and devisees, for an injunction to restrain them from conveying the farm to others, and compel them to convey the legal title to him. Much testimony was offered as to admissions by Israel. The master found that the evidence was insufficient to prove that the father's (William Walter's) money bought the farm, and therefore, that, as no trust resulted, the bill should be dismissed. The court below confirmed the report and dismissed the bill. *Held*, that the decree should not be disturbed.

(Argued February 8, 1887. Decided February 21, 1887.)

January Term, 1886, No. 27, E. D., before Mercur, Ch. J., Gordon, Paxson, Trunkey, Sterrett, Green, and Clark, JJ. Appeal from a decree of the Common Pleas of Chester County overruling exceptions to a master's report, confirming the report, and dismissing a bill for an injunction. Affirmed.

The bill alleged that in the latter part of the year 1866, or the beginning of 1867, William Walter, the father, placed in the hands of Israel H. Walter, his son, the sum of $3,100, for the purpose of purchasing a farm for Marshall Walter, another son, and his family, on the trust that Marshall should have the possession, and should use, occupy, and enjoy the farm during his life, and that at his death it should be conveyed to his children in fee simple; that on March 19, 1867, Israel H. Walter

Note.—For proof of resulting trusts, see note to Ackley v. Ackley, 1 Sad. Rep. 138, and Buck v. Henderson, 3 Sad. Rep. 111.

purchased a property in Chester county, for the purposes aforesaid and took the title in his own name, in fee simple; that he had since died without making provision to carry out the alleged trust, and that the defendants, his executor and devisees, threatened to sell and convey away the property thus held, to the complainants' injury.

The bill prayed an injunction to restrain the defendants from parting with the title and to require the defendants to grant and convey the premises named to a proper person in trust, for the use of Marshall Walter for life, and to his children at his death, in fee simple.

The answer admitted the purchase by Israel H. Walter, but alleged that he paid for it with his own money, and not with the money placed in his hands, directly or indirectly, by William · Walter; and further, denied all knowledge of any trust for the uses and purposes specified in the complainants' bill, or for any other trust whatever.

The cause was referred to R. T. Cornwell, Esq., as master, who found, *inter alia,* the following facts:

In the fall of 1866 William Walter requested his daughters, Mary M. Garrett and Malinda Sharpless, to look out for a farm for Marshall near home.

They reported the approaching sale of a small farm of 12 acres, near West Chester, and William Walter requested his son Israel, a resident of Philadelphia, to go and look at it, which he did and thought it would suit Marshall. William Walter told Israel to buy the place, and he would furnish the money to pay for it. The purchase was to be for Marshall for life, and for his children afterwards.

On November 29, 1866, Israel bought the farm and paid $100 on it then, and $3,000 on it about March 19, 1867, being balance of purchase money, when Marshall took possession of it and has remained on it ever since.

To secure the farm to Marshall in case of Israel's death, the latter made his will August 3, 1868, in which he gave the farm to trustees for use of Marshall for life, and to Marshall's children afterwards, and ordered the collateral and succession taxes to be paid out of his own estate.

Israel became financially embarrassed, and on April 16, 1878, he made an assignment for the benefit of his creditors. He did not include Marshall's farm in the inventory of his assets; and

during the settlement of his estate he said that he had provided for Marshall, and requested his brothers and sisters to say nothing about the farm, because if his creditors found out that he had the title, they would take it from Marshall. He had not returned the farm to his assignee, because he did not consider that it was his.

During and after this period he told different witnesses that he did not return the place among his assets to his assignee, because he did not consider the place belonged to him, but to Marshall. While in his troubles in 1878, he visited two ladies, old friends, whom he looked upon as sisters, and told them that what worried him most was the affairs of Marshall, that he had not returned Marshall's property to his assignee, for his father had given him the money to buy the place for Marshall.

Marshall paid all the taxes and insurance dues, and Israel paid him interest on the trust fund of $1,192.15, until January 1, 1878, about the time he was getting into financial difficulties, since which time it has been withheld, and its payment is demanded in another court.

On December 16, 1881, Israel was run over by a freight car, and his arm crushed and amputated.

On the 17th of December, about 10 o'clock in the forenoon, while *in extremis,* he made another will, in which he gave all his estate to his two daughters, and in a subsequent paragraph gave the Chester county farm to them.

He soon after sank into unconsciousness, and died about 2 o'clock next morning.

·The master reviewed the testimony as follows:

The occupation of the property by Marshall, his payment of the taxes, the statements shown to have been made so frequently by Israel, that he had bought the place as a home for Marshall, are all a part of and consistent with the defendants' position and proof.

The alleged admissions made by Israel, after his assignment for benefit of creditors, to Jane J. Stoker, Miss Verdette, and his brothers, George and Wilmer, when considered in connection with the surrounding circumstances, do not carry conviction to the mind of the master. The anxiety manifested by Israel that Marshall should not be disturbed, and his desire to keep all knowledge of the property from the assignees and creditors,

make rather against the plaintiffs than for them. If Israel had held the property simply as trustee, and not in his own right, he could readily have satisfied all parties concerned of that fact, and there would not have been the slightest occasion for anxiety and concealment.

The assignment could not have disturbed the trust any more than it could his executorship under his father's will. His keen distress of mind on Marshall's account, and his effort to keep the matter secret, indicate that in his judgment, as well as in the judgment of his counsel, the property was so held by him as to pass by the assignment and be liable for his debts. Under the circumstances he was led to expressions of extenuation for not returning the property to the assignee. If he then declared that he did not regard the property as his own, as his father had furnished money to pay for it, what did he mean? Did he mean more than that his father had furnished, by his will, money (which, perchance, was swept away by the assignment) to be used, to be to secure it or other property, as a home for Marshall? It is apparent that that was all he meant when he told his brother, William W. Walter (plaintiffs' witness), that he had bought the place so that Marshall might have a home as long as he lived, and that the $1,192.15 was to go into it, so as to secure Marshall; for Wilmer says that he felt worried about it, because they all looked to Israel as having the money belonging to their father's estate, and they knew by the will it was to be invested in a farm for Marshall.

This is the obvious meaning of Wilmer's testimony. Such language as this is wholly at variance and inconsistent with the idea that the equitable title to the farm was already entirely in Marshall and his children, for in that case the $1,192.15, remaining in the hands of Israel, as one of the executors of his father, for the use of Marshall and his children, would have to be secured, if secured at all, not in the farm, but wholly outside of it.

These alleged admissions are all verbal, and care should be taken in considering them.

It may well be that Israel (in view of the fact that he had in his hands, as executor, moneys to be invested in real estate for the benefit of Marshall and his children) was himself a little confused as to his legal relation to the property he had bought before his father's death, and used language that did not clearly express his meaning.

Mr. Greenleaf, in his treatise on the law of evidence, vol. 1, § 200, clearly enforces the care to be observed in such cases. He says: "With respect to all verbal admissions, it may be observed that they ought to be received with great caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say."

The learned counsel for the plaintiffs argue that the first will of Israel H. Walter, made in 1868, supports their case in that it shows that Israel at an early date after the purchase of the property, took this means of securing it to Marshall and his children, in accordance with the alleged trust under which he held it.

This will, however, when properly considered, argues the contrary view. It is not at all strange, indeed it is quite natural, that if Israel owned the property in his own right, in his then financial condition, he should have devised it to his unfortunate brother and his family, for whom he desired to furnish a home.

The disposal of the property by will was itself an assumption of absolute ownership, and the devise of it over to his own family by Israel, in the event of Marshall's dying without issue, was inconsistent with the notion that it was no part of his individual estate.

Thus stands the matter upon the plaintiffs' own proof. When we come to consider the letters written by Mrs. Sharpless, William Walter, and Marshall Walter, about the time of the purchase, and referring to it, it seems to the master difficult to conclude that anybody then regarded William Walter as the purchaser.

Mrs. Sharpless, in her letter to Israel, dated November 25, 1866, only four days before the purchase of the Bonham property, calls his attention to properties varying in price from $2,500 to $15,000, and does not say a word from which it could be inferred that her father, William Walter, was at all concerned in the matter. She writes as though the only question was how much he (Israel) could be prevailed upon to give.

It was worthy of note that in none of the letters offered on either side is there a suggestion that William Walter had anything to do with, or any interest in, this purchase; while in some of them there are expressions that seem inconsistent with the notion that the father could have furnished the purchase money.

William Walter himself, in his letter to Israel, written January 19, 1867, less than two months after the latter was out and bought the Bonham place, says that he had received a letter from Malinda Sharpless, dated the first of that month, pretty much all about Marshall, and what she thinks he ought to do for his welfare; that his views and hers did not agree; that in months back he had offered to buy a place for Marshall; that he offered at one time to give $1,600, but that did not suit all parties; that he said all the time and still thought three or four acres were enough for him, etc.

Still more decisive and significant is his letter to Israel, dated December 29, 1867, about six months after Marshall moved on the property. He says: "I am well aware that for some time I have been considered by some of my children not to do my duty by Marshall. It is true I could buy a small farm and let him have it. He could not live without help by either thee or myself," etc.

In Marshall's letter to Israel, dated February 15, 1876, he says: "In conclusion, blame old Billy Walter for everything I do; he promised if you bought a place, he would stock it for me. I have two or three good witnesses to prove it," etc.

It is quite clear that William Walter, by his will, did intend to provide a fund for the purchase of that property, or some other, for Marshall and his family. He left him two ninths of the residue of his estate, $500 of which was to be paid to him, and the remainder to be invested in suitable real estate for him and his family during his life, and after his death for his children. It is quite possible that William Walter told Israel that he would provide purchase money for a property for Marshall by a provision in his will, and that Israel expected when he bought the farm to invest Marshall's share of his father's estate, when it came to hand, in that property. But that is not enough to fix any trust upon the property.

It is well settled in this state, as it is in England, that if one purchases land as the agent, and with the money of another, and takes the deed in his own name, a trust results by presumption

or implication of law, to him who advances the money. So where the land has been purchased with trust money, a trust will result in favor of the *cestui que trust,* the real owner of the money. Such trusts are not within the statute of frauds, and may be established by parol. Jackman v. Ringland, 4 Watts & S. 149; Bratton v. Mitchell, 3 Pa. St. 44; Kisler v. Kisler, 2 Watts, 323, 27 Am. Dec. 308; Beck v. Graybill, 28 Pa. 66; Nixon's Appeal, 63 Pa. 279; Lench v. Lench, 10 Ves. Jr. 517.

But the money must be paid at the time; a subsequent payment will not answer. A resultant trust will not arise from an advance of money to the purchaser after the purchase is complete. Nixon's Appeal, 63 Pa. 279; Barnet v. Dougherty, 32 Pa. 372; Botsford v. Burr, 2 Johns. Ch. 408.

As we have said, a resultant trust may be established by parol evidence, but such evidence must be full, clear, and satisfactory.

As the authorities say, it must not only be clear, distinct, and credible, but it must preponderate; otherwise the presumption is in favor of the party who has the deed. Nixon's Appeal, 63 Pa. 279; Capehart v. Capehart, 2 Phila. 134.

In Buchanan v. Streeper, 11 W. N. C. 434, it is said that to establish a resultant trust from the payment of purchase money the evidence must be full, clear, and convincing, and go distinctly to the fact of payment.

The plaintiffs' proofs in the case before us do not, in the opinion of the master, meet these plain requirements of the law, and he must therefore recommend that the bill be dismissed.

The plaintiffs filed exceptions which were dismissed by the court in the following opinion by FUTHEY, P. J.:

The only question in this case is whether the real estate in controversy was purchased by Israel H. Walter, with money furnished or provided for that purpose by William Walter, or whether it was paid for by Israel H. Walter from his own proper funds. If purchased with funds furnished by William Walter for that purpose, the plaintiffs are entitled to a decree in their favor; otherwise, as the title is in Israel H. Walter, the bill must be dismissed.

The master, in a very full and exhaustive report, finds that the evidence fails to show that William Walter furnished any portion of the purchase money with which Israel H. Walter purchased the property in question, but that it was purchased by

Israel with his own moneys, and that it has ever since its purchase belonged to him.

We have carefully considered the evidence in the cause, and entirely concur with the master in his findings of fact. His conclusion that the bill must be dismissed necessarily follows.

The property in question was purchased by Israel H. Walter in 1867. William Walter died in 1870, and by his will, made after the purchase by Israel, left a share of his estate to his son Marshall Walter, a portion thereof to be paid to him, and the remainder invested in real estate for his use and that of his family. The share of Marshall thus to be invested was, on the settlement of the estate, found to be the sum of $1,192.15. This was not invested in real estate, but remained in the hands of Israel H. Walter, one of the executors of William Walter; and the interest thereof was annually paid by him to Marshall Walter, from the time he acquired it until 1878, when, under the circumstances detailed by the master, he ceased to pay interest. These moneys with their accumulations, if any, are in the hands of the executors of Israel H. Walter, to be paid over on the settlement of the account to whomsoever the court may appoint to receive the same, or for such other disposition as may be made of them. They formed no part of the purchase money of the real estate in question, and it is not impressed with any trust on account thereof.

We agree with the master that the bill must be dismissed.

A decree was entered accordingly.

The assignments of error specified the action of the court in overruling complainants' exceptions to the report of the master; in concurring with the master in his findings of fact, and in his conclusion from the facts found that the bill of the complainants must be dismissed; in making a decree confirming the report of the master and dismissing the bill of the complainants; and in refusing to make a decree in accordance with the prayer of complainants' bill, or to give such relief as the case required.

*Washington Townsend* and *James C. Sellers,* for appellants. —A decree not warranted by the facts shown in the case may for that reason be reversed. Phillips's Appeal, 68 Pa. 130–138; Hindman's Appeal, 85 Pa. 466, 470; Cake's Appeal, 16 W. N. C. 489; Kutz's Appeal, 12 W. N. C. 27.

The proviso of the statute of frauds, April 22, 1856, declares "that where any conveyance shall be made of any lands or tenements, by which a trust or confidence shall or may arise or result by implication or construction of law, or be transferred or extinguished by act or operation of law, then in every such case such trust or confidence shall be of the like force and effect as if this act had not been passed."

Israel's admissions create a trust by operation or implication of law.

In Gregory v. Setter, 1 Dall. 193, 1 L. ed. 96, the court said: "In this case a deed was made of the house in question to Mrs. Gregory in fee simple; and evidence is offered to prove that the purchase was made with money of her deceased husband, part of which belonged to his children, and that the purchase was for their and her use. If she acknowledged this fact at any time, it amounts to a confession against herself, which may certainly be given in evidence."

The acknowledgment of a trust at any time amounts to a confession and may be given in evidence. Williard v. Williard, 56 Pa. 119.

Where an estate is purchased in the name of one person with the money of another, or in cases of fraud, and where transactions have been carried on *mala fide,* there is a resulting trust by operation of law. German v. Gabbald, 3 Binn. 304, 5 Am. Dec. 372; Lloyd v. Spillet, 2 Atk. 148; Brown v. Dysinger, 1 Rawle, 408,

The declarations of a person while holding the legal title to an estate, that he was merely a trustee for another who had paid the purchase money, are admissible in evidence against those claiming under him; although he be, at the time such declarations were offered in evidence, in full life, within the reach of the process of the court, and capable of being examined as a witness. Gibblehouse v. Strong, 3 Rawle, 437.

Declarations of a person under whom a party claims may be given in evidence against him, if made during the term that such person was the owner of the land. Reed v. Dickey, 1 Watts, 152.

Most of the above cases were previous to the act of 1856, and under the statute, 29 Car. II., chap. 3, §§ 7, 8. Our act of 1856 is almost in the same words.

Although no one can be compelled to part with his own title by force of a mere verbal bargain, yet when he procures a title

from another, which he could not have obtained except by a confidence reposed in him, then the case is different. There, if he abuse the confidence so reposed, he is converted into a trustee *ex maleficio.* The statute which was intended to prevent frauds turns against him as the perpetrator of a fraud. Seichrist's Appeal, 66 Pa. 237; Squires's Appeal, 70 Pa. 266; Beegle v. Wentz, 55 Pa. 369, 93 Am. Dec. 762.

The 4th section of the act of 1866 has made no alteration in, what has heretofore been the established rule on this subject in Pennsylvania. Ballentine v. White, 77 Pa. 20; Barnet v. Dougherty, 32 Pa. 371; Bickel's Appeal, 86 Pa. 204; Stafford v. Wheeler, 93 Pa. 462; Cross's Appeal, 97 Pa. 471; Nixon's Appeal, 63 Pa. 279; Church v. Ruland, 64 Pa. 432.

Where a trust arises by implication of law, a court of equity will decree that the person holding the title shall make a conveyance to the *cestuis que trust,* for their interest therein. Jackman v. Ringland, 4 Watts & S. 150; Raybold v. Raybold, 20 Pa. 308; Church v. Ruland, 64 Pa. 432; Socher's Appeal, 104 Pa. 609; Hess's Appeal, 112 Pa. 168, 4 Atl. 340.

*J. Rich Grier* and *W. B. Waddell,* for appellees.—A master's finding of facts confirmed by the court below will be set aside for plain error only. Kisor's Appeal, 62 Pa. 428; Sproull's Appeal, 71 Pa. 137; Burton's Appeal, 93 Pa. 214.

In Clarkson v. Norton, 31 Phila. Leg. Int. 277, the court says: "To overcome the finding of the master, confirmed by the court below, the mistake should be plain, or the weight of evidence opposed to it, clear."

A master's report, confirmed by the court below, will not be reversed on a question of fact, unless it is a very plain mistake. Shoemaker v. Mutual Live Stock Ins. Co. 32 Phila. Leg. Int. 264.

In the absence of sufficient evidence of plain mistake, the facts reported by the master, and affirmed by the court below, will be considered as properly found. Trexler v. Mennig, 33 Phila. Leg. Int. 321.

A trust which arises or results by implication, or construction of law, from payment of the purchase money, may be established by parol evidence; but such evidence must be clear and unequivocal, not only that the money was paid, but was paid at the time. Nixon's Appeal, 63 Pa. 279, 282.

The doctrine of resulting trusts from payment of the purchase money may be established on parol evidence, but the evidence must be full, clear, and satisfactory. Boyd v. McLean, 1 Johns. Ch. 582; Barnet v. Dougherty, 32 Pa. 371; Bennett v. Fulmer, 49 Pa. 155–163; Emerick v. Emerick, 3 Phila. 94; McGinity v. McGinity, 63 Pa. 38; Plumer v. Guthrie, 76 Pa. 441–457.

It is well settled that a resulting trust may be established by parol proof; but as the foundation of the trust is the payment of the money that must be clearly proved. Willis v. Willis, 2 Atk. 71; Botsford v. Burr, 2 Johns. Ch. 408.

Such a trust cannot be established by inference.

A resulting trust may be established upon the parol declarations or acknowledgments of the person in whose name the conveyance is taken, that another paid the purchase money; such evidence, however, is admitted to be most unsatisfactory, on account of the facility with which it may be fabricated, and the impossibility of contradicting it, and the total alteration of the effect which the slightest mistake, or failure of recollection, may cause. If plain and consistent and corroborated by circumstances, it may be sufficient. Malin v. Malin, 1 Wend. 626; Harder v. Harder, 2 Sandf. Ch. 17.

In Botsford v. Burr, 2 Johns. Ch. 404, the court was considering the effect to be given to such confessions or declarations. The witness had testified that the defendant in that case said "he received $90 of the plaintiff, towards paying for the Elemdorf lot." The court says: "The observation of Sir William Grant (10 Ves. Jr. 517) is very applicable to this case, and he was speaking on a similar point: 'The witness swears to no fact, or circumstance capable of being investigated, or contradicted, but merely to a naked declaration of the purchaser, admitting that the purchase was made with the trust money. That is, in all cases, most unsatisfactory evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it. Besides, the slightest mistake, or failure of recollection, may totally alter the effect of the declaration.'"

The case above referred to is that of Lench v. Lench, 10 Ves. Jr. 511, *516, and Sir William Grant, in delivering the opinion, after stating the above principle, goes on to say of the case he was then investigating: "There are no corroborating circumstances by any writing under his hand. In most of the cases there has been, at least, something in writing; some account, by

which it appeared that the fund was laid out. This case has not the circumstance considered of weight in other cases: the inability of the husband to make the purchase with other funds."

These alleged declarations were made, if made at all, six years after the purchase.

To be of any weight, the expressions or declarations should be made contemporaneously with, or in contemplation of, the act of disposition. Edwards v. Edwards, 39 Pa. 378; Lloyd v. Lynch, 28 Pa. 419, 70 Am. Dec. 137; Tritt v. Crotzer, 13 Pa. 455; Kilpin v. Kilpin, 1 Myl. & K. 537.

The exceptions to the act of 1856 are in favor of resulting, not express, trusts; trusts that by operation of law result from actual fraud of the party taking the title, or the payment for the property with the money of the *cestui que trust*. Braden v. Workman, 1 Sad. Rep. 224, and Dilts v. Stewart, 1 Sad. Rep. 230.

PER CURIAM:

A careful examination of the record fails to convict the master of error in his finding of facts. The learned judge concurred with the master and dismissed the bill. We see no error in the decree.

Decree affirmed and appeal dismissed, at the costs of the appellants.